STATE, Plaintiff, v. HEILPRIN, Defendant.

*No. State 94. Argued May 2, 1973.—Decided June 18, 1973.*
(Also reported in 207 N. W. 2d 878.)

For the plaintiff there was a brief and oral argument by *James A. Drill* of New Richmond.

For the defendant there was a brief by *Curtis M. Kirkhuff* and *Johnson, Bieber & Kirkhuff*, all of Madison, and oral argument by *Curtis M. Kirkhuff*.

PER CURIAM. Richard Heilprin is thirty-nine years of age, a resident of Madison, Wisconsin, and has practiced law in this state for thirteen years. He is married and has two children.

The complaint in this proceeding alleges as follows:

1. On November 6, 1970, he "conducted himself in a rude, discourteous, offensive, and unprofessional manner in conversations with Julia Hunt of the office of the Dane County Clerk of Courts," at which time he called Mrs. Hunt "stupid, irresponsible and derelict in her duty" and threatened to have her removed from her job and thrown in jail for improperly disbursing funds;

2. On November 13, 1970, and on numerous prior occasions, he similarly conducted himself with Julia Hunt and several other members of the office staff of the Dane County Clerk of Courts, creating a disturbance at which he was loud and abusive, characterized all the clerks as incompetent and accused them of dishonesty, stupidity, dereliction of duty, and favoritism toward certain attorneys;

3. From August 3 through August 11, 1970, he made abusive telephone calls to Mr. and Mrs. Ivan Kalin in an attempt to coerce settlement of a claim against their son, at which time he threatened an expensive lawsuit he knew to be without merit, threatened to kick Mr. Kalin's "ass from wall to wall" and told Mr. Kalin that

he (Heilprin) was a "killer" as Kalin would soon find out;

4. On September 23 and 25, 1969, he made abusive telephone calls to the wives of the principals of the Madison business firm of Hoff & Lem, Inc., and to that firm's secretary to whom he said such things as "If you don't tell me your name, I'll call the police and they'll come up and get your name," "You go in there and kick that goddamn door down," "Get that son of a bitch on the telephone," and "You get that jackass," and obtained a $550 check from Mr. Hoff upon the false assertion that Mr. Lem wanted to settle a claim.

5. During January or February of 1970, he made sexual advances to N——— S———, a client, at her initial visit, at which time he talked obscenely, indecently exposed himself, touched N——— S——— in her chest and pelvic areas, and proposed sexual intercourse; he repeated all but the indecent exposure on the client's second visit;

6. During August or September of 1970, he made sexual advances to D——— M———, a client, at her initial visit, at which time he talked obscenely and made indecent gestures; he repeated this conduct at her second visit and also indecently exposed himself; and in subsequent telephone conversations he talked obscenely and made indecent sexual proposals;

7. On October 6, 1970, he commenced an action on behalf of a client against Erdman & Associates, Inc., in the course of which he made a settlement demand of more than twice the amount in dispute; threatened to "queer federal financing by filing a lien" on the project involved in the action; threatened to collect 10% from the IRS for reporting that Erdman's pension trust was nonexempt; accused Erdman of "inside dealing with Madison Bank & Trust;" accused Erdman of "committing a fraud on the federal government;" threatened to "put Erdman out of business," stating that he knew

where to draw the line with respect to abuse of process, and threatened that if Erdman representatives did not agree to a 45 minute delay in taking depositions, his "first stop would be at the IRS for ten percent."

Either by answer or stipulation, Heilprin admitted all allegations in the complaint except that he knew the threatened lawsuit against Mr. Kalin to be without merit, that he obtained a $550 check from Mr. Hoff upon a false representation, and that he made sexual advances or exposed himself to N——— S——— and D——— M——— on more than one occasion. Heilprin then set up the affirmative defense that he was inflicted with a personality disorder for which he sought medical treatment and which was a major contributing factor in causing his problems. At a hearing on August 9, 1972, over objection by the defense, the state produced witnesses to testify as to the allegations of the complaint which were already admitted.

Mr. Ivan Kalin testified that in August of 1970, he came home and found his wife in tears. She told him that an attorney called with regard to their twenty-three-year-old son. The next day, Heilprin called Kalin at work, interrupting a business conference and stated he was representing a client who had a claim against Kalin's son which arose out of an automobile accident. The reason he called was that he understood Kalin had control over some money that belonged to Kalin's son. Heilprin stated he would settle for $3,000 if Kalin came over and made a settlement promptly. When Mr. Kalin stated he had nothing to do with his son's business, Heilprin told him he would settle for $3,000 or make Kalin sorry about it. Heilprin then added, "I just want you to know I'm a killer, and I can make it pretty tough for you." He further stated that if Kalin were in his office he would "kick his ass from wall to wall" and show what a killer he was.

Mrs. Julia Hunt, the Deputy Clerk of Courts for Dane County, testified that Heilprin often called the clerks stupid and incompetent if they could not take care of his business at the moment, and called her a "goddamn son of a bitch." He acted this way in more than 10 telephone conversations she had with him. On one particular occasion, Heilprin represented a certain client in two successive divorce actions, but failed to file a temporary order which would advise the clerks of the second action. By mistake, the clerks sent money paid in by Heilprin's client to the client's first wife instead of to the second for whom the payments were intended. When Heilprin discovered this, he kept Mrs. Hunt on the phone for over an hour, calling her stupid, incompetent and derelict in her duties. He told her he would call someone in the County Board's Personnel Department to see that she was removed from her job and would have the sheriff arrest her and put her in jail until she could produce the money that was mistakenly sent out. On another occasion, on November 13, 1970, Heilprin came into the clerk's office with a client at which time he called Mrs. Hunt incompetent and used profane language because she refused to send his client money until she received a termination notice from the department of social services. He ended the conversation by telling her it was time she kept her fingers out of the till and saw that people who were entitled to money were getting it.

Rose Richgels and Marion Mindrum, employees in the clerk of court's office, testified they received similar abuse from Heilprin. Marion Mindrum testified that on his November 13, 1970, outburst in the clerk's office, he pointed to her, stating, "And you over there are incompetent, derelict and cheat on the blind draw for the assignment of judges." In the year prior to the hearing, the clerks had no trouble with Heilprin. On April 7,

1971, he sent a letter of apology to Mrs. Hunt and all other office personnel in the clerk's office.

Also testifying at this hearing were Mrs. Helen Lem and Mrs. Patricia Hoff, the wives of the principals of Hoff & Lem, Inc. Mrs. Lem testified that Heilprin called her on the telephone on September 24 or 25, 1969, looking for her husband. When she stated she did not know where he was, he said she did know and he would keep calling until she told him. Heilprin threatened to send out the sheriff if she did not tell him where her husband could be found. She then hung up; he called back, but she hung up as soon as she discovered who it was. After these calls, she was very upset and frightened. Mrs. Hoff testified that Heilprin called her on September 23, 1969. He talked about some check upon which Lem stopped payment, adding "And you know what kind of a person Charlie (Lem) is." Heilprin mentioned calling the district attorney and the bad publicity which would result from the stopped payment of the check. She then hung up; he called again and she again hung up. Two days later, on September 25, 1969, he called again and told her there was a woman crying in his office because she had no food. Mrs. Hoff hung up. Heilprin called again and she again hung up. The third time she did not answer the phone but let it ring about 100 times.

On August 23, 1972, Heilprin presented his affirmative defense through expert testimony of Dr. Joseph G. Brown, a psychiatrist. Heilprin voluntarily absented himself from the hearing at this point because it was deemed harmful for him to hear the medical testimony. Dr. Brown first saw Heilprin on December 4, 1969, at which time Heilprin's chief difficulty was in the area of marital problems. Heilprin had a history of sexual problems within his marriage and, in 1964 or 1965, sought psychiatric treatment which was terminated because of a violent disagreement with the psychiatrist.

After the first interview, Dr. Brown diagnosed Heilprin's problem as being a personality disorder—that of an obsessive, compulsive personality. A personality disorder is not an illness, such as a psychosis or neurosis, but a disorder of behavior. It is recognized medical disability for which there is a treatment. It does not come into being, as such, until the individual's personality gets him in trouble, at which time it is labelled a "disorder."

Dr. Brown's first course of treatment was marital therapy with Mr. and Mrs. Heilprin and two psychiatrists. This continued until the end of December, 1970, at which time the other psychiatrist moved out of the city. Dr. Brown attempted to continue the marital therapy alone, but found it very difficult to do so and eventually terminated this method of treatment and saw Heilprin alone.

Heilprin made very little progress from December of 1969 until the autumn of 1970. During this time, Heilprin had been very abusive toward the doctor's staff. In the autumn of 1970, Dr. Brown told Heilprin this abusive treatment had to stop. At their next session, when the subject of his abusive behavior was brought up, Heilprin broke out in a violent burst of temper, accusing Dr. Brown of being anti-Semitic. Dr. Brown responded with astonishment and assured Heilprin he harbored no such feelings. From that point on, Heilprin made steady progress. It would take a great deal more stress now to break him down than it would have one year ago. In Dr. Brown's opinion, this improvement is partially due to the threat of disciplinary proceedings by the State Bar.

On the other hand, Heilprin still has problems in the area of emotional dependence upon his wife together with the stress this causes him, and his marital difficulties still exist. He suffers from the personality disorder which will require an indefinite period of further treatment. He is still liable to respond in a very aggressive and hostile manner should he feel himself "being

moved in upon." While the likelihood of sexual misconduct is not eliminated, it is greatly reduced from 1970. Dr. Brown anticipates further flare-ups, but believes their probability has greatly declined.

After Dr. Brown was excused, the state attempted to introduce evidence which would show that Heilprin had not in fact improved as the psychiatrist believed, and thus the expert opinion should be discounted. Because the state refused to recall Dr. Brown to question him on whether his opinion would change as a result of the further evidence of outbursts, however, the referee refused to allow the rebuttal testimony into evidence. The state then made an offer of proof that subsequent to March of 1972, Heilprin had several similar outbursts of loud and abusive conduct toward a former client and former legal associate.

The state now moves this court for:

1. A review of the referee's rejection of the rebuttal evidence and consideration of such evidence in further support of the findings;

2. A confirmation of the referee's findings of fact;

3. An order that the "medical disability" is not of such a nature as to constitute a defense to the imposition of discipline and an order imposing discipline; and

4. If the disability is deemed a defense, for an order indefinitely suspending Heilprin's license to practice law in accordance with the referee's recommendations.

Heilprin moves to set aside the referee's finding that he still suffers from the medical disability and the referee's recommendations on the ground that they are "against the great weight of the credible evidence in the record."

The state contends it was error to exclude the rebuttal evidence of more recent outbursts on the part of Heilprin because such evidence impeached Dr. Brown's testimony that the defendant's condition had improved, or if the condition did improve, it showed that the personality disorder had no relationship to the misconduct.

We think that the evidence offered in rebuttal was lacking in probative value and, hence, properly excluded. It failed to accomplish its purpose of showing that Dr. Brown's opinion as to Heilprin's progress was unworthy of belief; the mere incidence of further outbursts would not be inconsistent with the doctor's testimony; the doctor anticipated future flare-ups. There was no claim that Heilprin was cured, and the doctor's opinion was not based on the absence of recurring outbursts.

Both parties address themselves to the question of whether the evidence in support of the referee's findings was against the great weight and clear preponderance of the evidence. However, in attorney disciplinary proceedings, that test does not apply. The court must look to the record de novo to determine whether the facts therein warrant discipline or suspension. *State v. Weber* (1972), 55 Wis. 2d 548, 200 N. W. 2d 577. It is the state's burden to bring forth such facts by clear and satisfactory evidence, the middle burden of proof. *State v. Stumpf* (1972), 53 Wis. 2d 690, 695, 193 N. W. 2d 842. In this case, there is no real issue as to whether Heilprin committed acts of professional misconduct. He admitted the acts as outlined in the statement of facts, and thus, the state met its burden of proof.

Dr. Brown testified that the personality disorder was a major factor in and a substantial cause of Heilprin's misconduct. The state did not introduce any evidence which would destroy the credibility of this testimony. No evidence was offered which would disprove a causal relationship between the disorder and the acts. Thus, Dr. Brown's testimony is the only evidence on the issue of whether or not the personality disorder was the proximate cause of Heilprin's misconduct and must be accepted.

A question arises as to whether a personality disorder is such a disability as would absolve the defendant of responsibility for his actions.

This court has never held a personality disorder to be a cause for medical suspension. *State v. Cadden* (1972), 56 Wis. 2d 320, 201 N. W. 2d 773, involved a mental illness—schizophrenia. A personality disorder, as Dr. Brown testified, is not an illness, but a disorder of behavior. It is in effect a composite of personality traits which causes an individual difficulties in interactions with others. As Dr. Brown admitted, many of us have characteristics comprising the obsessive-compulsive personality. It is only when those characteristics get an individual into trouble that they are labelled a disorder. If this court would recognize a personality disorder as a defense to a disciplinary proceeding, every attorney who conducted himself in an obnoxious and unprofessional manner could point to his personality traits which would, by that time, be labelled a disorder because they led the individual into trouble.

Heilprin's actions were not completely out of his control in the sense that he could not understand the difference between right and wrong or appreciate the impropriety of his conduct.

We conclude that Heilprin's personality disorder does not excuse his misconduct. Conduct of the type engaged in by Heilprin cannot be condoned, whatever the cause. The public must not be exposed to this type of action from members of the legal profession.

We are satisfied there is clear, satisfactory and convincing evidence that Richard A. Heilprin is still liable to respond in a very aggressive and hostile manner in stress situations; further flare-ups are to be expected, and while the likelihood of further sexual misconduct is reduced, it is not eliminated. The public should not be exposed to the threat of future outbursts. Therefore, it is ordered and adjudged that the license of Richard A. Heilprin to practice law be and is hereby suspended until such time as by order of this court he is found

to have recovered from his personality disorder; defendant may petition this court for reinstatement of his license to practice law at such time as he is convinced his personality disorder has been removed; if defendant does so petition this court for reinstatement, this court will appoint an independent psychiatrist to evaluate the defendant's condition.

It is further ordered that the State Bar of Wisconsin notify the courts of record of these orders by sending each copies thereof.

It is further ordered that Richard A. Heilprin notify his clients now represented by him in all matters involving the practice of law or all matters pending in any court of this state that his license to practice law in this state is now suspended.